**IN THE COURT OF APPEALS OF IOWA**

No. 21-1672
Filed July 13, 2023

**IN RE THE MARRIAGE OF JAMIE ROBIN SOMMERVILLE
AND TARA MICHELLE SOMMERVILLE**

**Upon the Petition of
JAMIE ROBIN SOMMERVILLE,**
        Petitioner-Appellee/Cross-Appellant,

**And Concerning
TARA MICHELLE SOMMERVILLE,**
        Respondent-Appellant/Cross-Appellee.
_____

        Appeal from the Iowa District Court for Pottawattamie County,
Richard H. Davidson, Judge.


        Tara Sommerville and Jamie Sommerville appeal economic provisions of
the decree dissolving their marriage. **AFFIRMED AS MODIFIED AND
REMANDED.**


        P. Shawn McCann, of McGinn, Springer & Noethe, P.L.C., Council Bluffs,
for appellant/cross-appellee.

        Andrew B. Howie of Shindler, Anderson, Goplerud & Weese, P.C., West
Des Moines, for appellee/cross-appellant.


        Heard by Schumacher, P.J., and Chicchelly and Buller, JJ.

**CHICCHELLY, Judge.**

Tara Sommerville appeals the economic provisions of the decree dissolving her marriage to Jamie Sommerville. She contends the district court erred in determining Jamie's earning capacity and awarding child support and spousal support. She also contends Jamie dissipated marital assets by incurring penalties and interest when he failed to file and pay timely the parties' income taxes over a ten-year period. Finally, Tara challenges the division of the marital property and debt. On cross-appeal, Jamie contends the spousal-support award is too high.

Because the district court erred in determining the amount of Jamie's earnings, we remand to the district court for modification of the provisions of the decree relating to the amount of child support awarded. We also modify the amount and duration of the spousal support awarded to Tara. Finally, we affirm the district court's finding that Jamie did not dissipate marital assets and the property-division provisions of the decree.

**I. Background Facts and Proceedings.**

Jamie and Tara married in 1996 and have four children together. Tara worked in human resources until her place of employment closed in 2009. She returned to school in 2010 and earned her master's degree in mental health in 2012. Tara stayed home to parent the children fulltime until 2018, when she accepted a job as a school counselor. She earns a salary of $47,297.

Jamie works in construction. He and Tara formed Sommerville Resources Inc. (SRI), a chapter S corporation,[1] which performs commercial construction. Jamie did not receive a salary from SRI until 2018. Before then, Jamie and Tara withdrew from the business's accounts or paid directly from them to fund their personal expenses. Between 2015 and 2020, Jamie represented to different financial institutions that he earned an income of $180,000 per year. At trial, he claimed that SRI was struggling amid the COVID-19 pandemic, which necessitated a staff reduction and decreased expenditures. Jamie estimated that if SRI fails, he could earn about $70,000 per year working for another construction company.

Although the parties' personal and corporate tax returns were professionally prepared, they never filed returns for the years 2008 through 2016. In 2019, they filed returns for the years 2017 and 2018 but made no payment on their tax liability. As a result, they owe a significant amount of state and federal taxes, including penalties and interest.

Jamie petitioned to dissolve the marriage in 2018. Trial was delayed until 2021. In the decree dissolving the marriage, the district court granted the parties joint legal custody of the children and placed their physical care with Tara. It estimated Jamie's income at $70,000 per year in calculating his child-support obligation. After valuing and dividing the property, the court ordered Jamie to pay Tara $28,412 to equalize the distribution and held the parties jointly liable for their outstanding taxes. Finally, it ordered Jamie to pay Tara spousal support for ten

---

[1] Tara owns 51% of SRI so it would be identified as a female-owned business. But she had limited involvement with SRI. As the district court noted, "SRI is Jamie's business. He is the owner-operator that makes all of the decisions."

years. It set the amount of spousal support at $350 per month while two or more children are eligible for child support, $500 per month when one child is eligible for child support, and $1200 per month once child support ends.

## II. Scope of Review.

We review dissolution proceedings de novo. *In re Marriage of Mauer*, 874 N.W.2d 103, 106 (Iowa 2016). We give weight to the district court's fact findings although they are not binding. *Id.*

## III. Discussion.

On appeal, both parties challenge the amount and duration of spousal support awarded to Tara. Tara also challenges the amount of child support and the division of property and debts. We address each argument in turn.

### A. Support awards.

We begin with the awards of child support and spousal support. Resolution of both issues requires a determination of the parties' earnings. *See, e.g.*, *In re Marriage of Wade*, 780 N.W.2d 563, 566 (Iowa Ct. App. 2010) (observing that application of the child support guidelines requires determining the parties' net monthly income); *In re Marriage of Schenkelberg*, 824 N.W.2d 481, 486–87 (Iowa 2012) (stating an award of spousal support depends on the circumstances of each case and factors the comparative earning capacities of the parties). Because Tara challenges the district court's determination of Jamie's income,[2] we begin there.

The task of determining Jamie's income is complicated by his employment

---

[2] Neither party challenges the court's finding that Tara earns $47,297 per year.

with SRI. Although the business's earnings fluctuated over time, the district court found that both SRI and Jamie have been profitable and would continue to be:

> Jamie and SRI have a history of profitability. The years 2010 through 2018 were especially strong years for the company as it enjoyed steady commercial construction projects for brick and mortar stores such as Victoria's Secret and Bath & Body Works. SRI's largest customer changed ownership in 2019 and he was receiving less work from the customer even before the coronavirus pandemic. The court acknowledges that the pandemic and the loss of retail construction projects have affected SRI's bottom line. Yet, the economy is rebounding and home construction and other commercial construction will increase. SRI may operate with fewer employees but the court is confident that Jamie and the company will continue to be successful.

But the court then accepted Jamie's testimony that he could earn $70,000 per year if SRI fails because "there is little other evidence of Jamie's current income." Tara challenges this finding, arguing that Jamie earns $180,000 per year.

We determine the parties' incomes from the most reliable evidence presented. *In re Marriage of Powell*, 474 N.W.2d 531, 534 (Iowa 1991). Generally, the best evidence of income comes from completed income tax returns. *In re Marriage of Hansen*, 886 N.W.2d 868, 876 (Iowa Ct. App. 2016). But that income "may not necessarily equate to a party's adjusted net income on their tax return." *Id.* This may be especially true when calculating self-employed income or income generated from a closely held corporation. *See, e.g.*, *In re Marriage of Wiedemann*, 402 N.W.2d 744, 748 (Iowa 1987) ("It is not uncommon for an owner to cover many normal personal living expenses through the corporation or to over-depreciate or undervalue inventory, all of which would decrease profits while increasing the owner's standard of living or the actual value of the company's assets."); *In re Marriage of McKamey*, 522 N.W.2d 95, 99 (Iowa Ct. App. 1994)

(concluding that district court properly increased self-employed husband's income by amounts taken from business for personal use but claimed as business expenses on husband's tax returns); *In re Marriage of Claar*, No. 05-0174, 2006 WL 334219, at *3 (Iowa Ct. App. Feb. 15, 2006) (finding the adjusted gross income figures from the parties' income tax returns were "of little value in calculating child support" because they took significant deductions for self-employed husband's construction business and omitted cash and barter payments, and their actual income was sufficient to support a comfortable lifestyle that included a new home, vacations, and domestic help).

As the district court noted, there is little evidence of Jamie's recent earnings. The professionally prepared federal and state tax returns for the years 2008 through 2018 were admitted at trial, although only the 2017 and 2018 were filed. Jamie's personal tax return for 2019 are also in the record, but SRI's return is not. For 2020, the record includes only a schedule K-1 that purports to show Jamie's share of income, deductions, and credits for SRI, a statement of his unemployment insurance compensation payments, and copies of two personal checks made out to Jamie. Although the trial was held in 2021, we have no documentation of Jamie's earnings that year.[3] Two years have since passed.

---

[3] Jamie agreed that his 2020 earnings are "reflective" of what he was earning in 2021. At the same time, Jamie claimed that he did not know how much he earned in 2020:

> Q. What is your understanding as far as how much money you made in 2020 from SRI? A. Oh, I don't know that.
> Q. Okay. You have no understanding? A. No. I don't. I don't.
> Q. In all candor and honesty, do you have any understanding at all as far as how much you made in 2020? A. No, I didn't.
> Q. You've not kept track at all? A. I really haven't.

The district court found Jamie earns $70,000 per year based solely on his trial testimony, so we begin there. Jamie testified that SRI's past earnings are not indicative of its present earnings because of an economic downturn that began in 2018. Jamie claimed that he needs to reinvent the business for its survival, a process that will take time. Asked how he planned to earn money in 2021, Jamie explained how he was reducing SRI's business expenditures to "slim down our overhead as much as possible." Although Jamie's goal is keeping SRI in business, he testified about how he can earn money if it fails:

> Q. If it doesn't work given the pandemic and the commercial market, what will you do? A. Well, I don't have a college degree, so I would probably become a superintendent or a general foreman or something for another company.
> Q. And how much do you think you could earn if that were the case? A. Roughly $70,000.

On this basis, Jamie testified he was willing to impute to himself an income of $70,000 per year, and he submitted child support guidelines worksheets that used that adopted figure as his earnings.

Tara argues the court erred in accepting Jamie's testimony as evidence of his current earnings because of its stated concerns about his credibility. In the decree, the district court found:

> Jamie was evasive and less than forthcoming during his testimony concerning the finances of both SRI and the family. The court questions his credibility but in many instances, there was no other evidence presented. The court also finds it incredulous that Jamie did not disclose the couple's tax liability exposure when applying for bank credit. His lack of candor with his bankers, attorneys and on cross examination hangs over his testimony.

In view of these credibility findings, we are unwilling to base Jamie's income on his speculative and unsubstantiated testimony regarding how much he might earn if his business fails.

Tara claims that Jamie earns $180,000 per year. She testified that she reached this figure based on "what he's made in the past and his expenditures, what he's paid himself and spent since the divorce has been going on." She also cites credit applications he submitted in 2015, 2019, and 2020 in which he represented an annual income of $180,000.[4] Unlike Jamie, Tara provides some evidence supporting her claim. But that evidence is insufficient for us to base finding.

The best evidence of Jamie's income comes from the tax returns. Those documents show that even when SRI is performing well, its income fluctuates considerably with no easily identifiable trends. Jamie argues his historical earnings are not reliable evidence on which to base his current earnings because SRI encountered financial difficulties in the years leading up to the divorce. But this is not the first time SRI has struggled. Jamie testified that SRI had to "pivot" from residential to commercial construction because the market changed. Based on SRI's tax returns, it appears this occurred shortly after the business began in 2008. Although Jamie says that changing SRI's focus took time, it ultimately succeeded with earning its highest profits in 2014 and 2017.

Jamie testified that SRI's recent struggles began in 2018. But he continued working for SRI at the time of trial, and the district court stated its confidence in the

---

[4] Jamie minimized these representations at trial, testifying that the $180,000 figure "was probably a goal."

business's continued success. Although the records for the most recent years are incomplete or nonexistent, the court is not required to base its determination of a party's income on that party's most recent earnings. *See In re Marriage of Hagerla*, 698 N.W.2d 329, 332 (Iowa Ct. App. 2005). "[I]n some cases the only equitable way to determine income for purposes of child support is to average income over a period of time." *Id*. For those who are self-employed or have a fluctuating income, averaging income over a period may provide a more accurate reflection of earnings. *In re Marriage of Cossel*, 487 N.W.2d 679, 681 (Iowa Ct. App. 1992).

The prepared tax returns for the years 2008 through 2018 provide the best evidence of Jamie's earnings. Those years cover SRI's financial struggle in a bad market, transition to a different business model, and financial success, and they end with the start of the current economic downturn. During that period, SRI earned its lowest net profit of $77,044 in 2008 and its highest net profit of $205,942 in 2017. Jamie's personal tax returns show he earned between $81,154 and $224,873 during that time. Omitting his highest and lowest earnings and averaging his earnings for the remaining years, Jamie earned an average of $142,763 per year. This figure, which is in keeping with Jamie's continued spending, is more reflective of Jamie's earnings than the $70,000 used by the district court or the $180,000 urged by Tara. We remand to the district court to calculate the amount of child support based on Jamie earning $142,763 per year.

We turn then to the award of spousal support. The district court awarded Tara ten years of spousal support, varying the amount depending on the amount of child support she receives. While two or more children are eligible for support, the court ordered Jamie to pay Tara $350 per month. The amount of spousal

support increases to $500 per month when only one child is eligible. Finally, the award increases to $1200 per month once Jamie's child-support obligation ends.

Both parties challenge the amount and duration of the spousal-support award. Tara argues traditional spousal support is appropriate based on the length of the marriage. She also cites the lavish lifestyle she enjoyed during the marriage and argues she is incapable of supporting herself at the same standard. Jamie, on the other hand, argues the court should reduce or eliminate the award. He claims that he cannot support his own lifestyle while paying both spousal and child support and asks that any modification should be applied retroactively to the date of his first payment. If this court affirms the spousal-support award, Jamie asks that the court modify the award to terminate on either party's death or Tara's remarriage.

In determining spousal support, we look to the factors listed in Iowa Code section 598.21A(1) (2018). *In re Marriage of Mann*, 943 N.W.2d 15, 20 (Iowa 2020). Those factors include the length of the marriage, the age and health of the parties, the property award, and the earning capacity of the party seeking maintenance, plus any other factors the court deems relevant. *See* Iowa Code § 598.21A(1); *In re Marriage of Schenkelberg*, 824 N.W.2d 481, 486–87 (Iowa 2012) (stating an award of spousal support depends on the circumstances of each case). We recognize that the trial court has "considerable latitude" in awarding spousal support. *Mann*, 943 N.W.2d at 20 (citation omitted). We intervene on appeal "only where there is a failure to do equity." *In re Marriage of Gust*, 858 N.W.2d 402, 416 (Iowa 2015).

In awarding Tara spousal support, the court noted her financial struggle during the parties' separation. It observed that without Jamie's ability to tap into SRI's resources, Tara was "forced . . . to borrow money from her parents, trade vehicles, skip rental payments to her uncle-landlord, and seek tuition assistance from [the children's school]. Tara has not attempted to use the lake house in part because of the expense of gas for the boats." In contrast, it found Jamie was in a superior financial situation, noting he "has continued his trips to the lake house and recently vacationed out of state in Texas and Wyoming."

An award of traditional spousal support is warranted under the factors set out in section 598.21A(1). Jamie's income of $142,763 per year is substantially higher than Tara's income of $47,297 per year, providing Jamie with discretionary income while Tara struggles to pay basic expenses. Because the parties were married for twenty-four years, Tara is entitled to an award of traditional spousal support. *See In re Marriage of Sokol*, 985 N.W.2d 177, 185 (Iowa 2023) (noting a marriage of this length crosses the "durational threshold" to merit "serious consideration for traditional spousal support" (quoting *Gust*, 858 N.W.2d at 410–11)). "[T]he duration of support should correspond with need." *Id.* It "is normally payable until the death of either party, the payee's remarriage, or until the dependent is capable of self-support at the lifestyle to which the party was accustomed during the marriage." *Id.* If possible, we fix support to allow both parties to continue their standard of living. *Id.*

We turn to the financial condition of the parties. Tara's net monthly income is $3401, and her affidavit of financial status lists monthly expenses totaling $7304. Jamie's net monthly income is $8057, and he testified his monthly expenses total

$6889. Based on Tara's need and Jamie's ability to pay, we modify the decree to award Tara $1800 per month in spousal support, terminating at the death of either party. We decline Jamie's request to end spousal support automatically on Tara's remarriage. *See In re Marriage of Mihm*, 842 N.W.2d 378, 382 (Iowa 2014) (stating that "remarriage of an ex-spouse does not automatically terminate spousal support"). In the event Tara remarries, Jamie may seek modification of the award, and Tara would bear the burden of showing "extant extraordinary circumstances that justify continuing the support." *Id.*

### B. Income taxes and penalties.

Tara next challenges the portion of the decree addressing the parties' outstanding tax liability. Between 2008 and 2016, the parties' personal returns and SRI's corporate returns were prepared but not filed, and they failed to pay any of the taxes due in those years. In 2019, they filed returns in 2017 and 2018 but failed to pay the taxes owed for those years.

The court found that despite the ownership records, Jamie is the owner of SRI and made all the decisions regarding the company. It noted that he was the sole source of the family's income in most of the years that taxes were not paid. It found Tara's testimony that she was unaware that Jamie failed to pay the taxes was "credible but also naïve." Ultimately, it found that Jamie and Tara were jointly responsible for their outstanding tax debt:

> While Jamie is the more culpable for his decision to not file the returns and pay the taxes, Tara cannot escape responsibility as part owner of SRI. It is hard to imagine Tara did not question that she was not asked to sign a personal return. At bottom, both Tara and Jamie were responsible for insuring annual corporate returns, as well as the personal tax returns, were filed and taxes paid.

As a result, the court treated the outstanding taxes as a marital debt.

Tara argues that Jamie's failure to file the parties' income taxes and pay their tax liability amounts to dissipation of marital assets for which he should be held solely responsible. The courts use a two-pronged test in determining whether dissipation occurred. *See In re Marriage of Kimbro*, 826 N.W.2d 696, 701 (Iowa 2013). First, the court asks whether the purpose of the expenditure of marital funds is supported by the evidence. *See id.* The court then determines whether the purpose was dissipation. To identify dissipation, the court considers:

> (1) the proximity of the expenditure to the parties' separation, (2) whether the expenditure was typical of expenditures made by the parties prior to the breakdown of the marriage, (3) whether the expenditure benefited the 'joint' marital enterprise or was for the benefit of one spouse to the exclusion of the other, and (4) the need for, and the amount of, the expenditure.

*Id.* (citation omitted).

We decline to treat Jamie's failure to file tax returns and pay income tax as dissipation of the assets. The nonpayment of taxes occurred over a ten-year period preceding the dissolution action. Although Tara was unaware of the debt, nothing in the record shows that the nonpayment of taxes benefitted Jamie to the exclusion of Tara. Both parties benefited from the income on which the taxes were assessed. Both benefited from expenditures made in lieu of those tax payments. On this basis, we affirm the decree's treatment of the outstanding tax liability as a joint marital debt to be divided between the parties.

**C. Property division.**

Finally, Tara challenges the five provisions relating to the decree's division of property. We begin with the well-established tenets of property division:

Iowa is an equitable distribution jurisdiction. In dissolution-of-marriage cases, marital property is to be divided equitably, considering the factors outlined in Iowa Code section 598.21(5). Iowa Code section 598.21(5) provides that the court shall divide *all* property, except inherited property or gifts received or expected by one party, equitably between the parties after considering certain factors. Inherited and gifted property can be subject to division if the court finds that refusal to divide the property is inequitable to the other party or to the children of the marriage. An equitable distribution of marital property, based upon the factors in 598.21(5), does not require an equal division of assets.

The legislature's choice of the word "all" creates an expansive marital pot. Beyond the specific exclusion of gifts and inherited property, the statute makes no effort to include or exclude property from the divisible estate. For example, the statute also encompasses property owned by a party before the marriage. The circumstances and underlying nature of the included property are generally considered as factors that impact the task of determining an equitable division, along with all other relevant factors listed in section 598.21(5). However, future earnings are not considered property subject to division at the time of the dissolution.

*In re Marriage of Miller*, 966 N.W.2d 630, 635–36 (Iowa 2021) (cleaned up).

### 1. 1967 Ford pickup

Tara first objects to the court awarding her a 1967 Ford pickup truck valued at $13,800. Tara argues she has "no interest in owning" the vehicle and asks that we award it to Jamie instead and adjust the equalization payment accordingly. We decline to do so. As the district court found, Tara can sell the vehicle if she desires. No adjustment is required.

### 2. Retention of $27,020

Tara next complains that the court found she retained $21,000 in wages and $6020 from a vehicle trade for her sole and separate use. We defer to the district court's finding on this issue.

### 3. Household items

Tara also disputes the court's valuation of the household property divided between the parties. The court attributed a $10,000 value to the items Tara received and a $1000 value to the items Jamie received. But Tara claims the items should not be valued because each party took what they wanted, thus leading to an equitable division. Tara asks that we remove the property from the overall distribution and adjust the equalization payment accordingly. We find no error. The parties did not agree that the items kept by each are of equal value, and the values assigned by the district court are within the permissible range of the evidence.

### 4. Lighthouse Management

Tara next contends the court erred in valuing Lighthouse Management, another business the parties owned. The court awarded the property to Jamie and assigned it a value of -$3035. Tara argues the property is worth $72,695.

The evidence shows the property owned by Lighthouse Management has a market value of $163,915. However, the property is encumbered by debt totaling $166,949. As a result, the business has a negative net value. We affirm the district court.

### 5. America National Bank debt

Finally, Tara contends the court erred by ordering the funds in the escrow account of the parties' marital home be used to pay a debt owed to America National Bank. Tara argues the debt was incurred when SRI's bank account was overdrawn after it was closed. Tara claims that the debt should be removed from

the list of marital debts because it was caused by Jamie's actions and the court awarded SRI to Jamie. We again defer to the district court and affirm.

**AFFIRMED AS MODIFIED AND REMANDED.**

Buller, J., concurs; Schumacher, P.J., partially dissents.

**SCHUMACHER, Presiding Judge** (dissenting in part).

I concur in the majority opinion regarding the issues of dissipation of marital assets, the property division provisions of the decree, and the remand to the district court for child support recalculation. And I concur in the majority's calculation of the amount of Jamie's income for child support and alimony purposes using the historical data contained in the parties' tax returns. I respectfully depart ways from the majority opinion only in regard to the amount of traditional spousal support ordered to be paid by Jamie, finding such too great given the relative incomes of the parties, the existing marital debt, and relative tax consequences.

I agree with the majority opinion that traditional alimony to Tara is warranted, but based on recent supreme court cases and a change in the tax laws concerning deductibility of alimony for tax purposes, I disagree with the amount of alimony ordered in the majority opinion, given the income of $142,763 for Jamie and $47,297 for Tara.

Alimony payments are no longer tax deductible and are not considered taxable income to the person receiving them. Tax Cuts and Jobs Act, Pub. L. No. 115–97, § 11051, 131 Stat. 2054, 2089 (2017) (repealing 26 U.S.C. § 215). "As a result, the economic impact of alimony on the paying spouse is greater today than it has been in the past." *In re Marriage of Mann*, 943 N.W.2d 15, 21 (Iowa 2020). As noted by our supreme court, by way of example, in *In re Marriage of Gust*, alimony was awarded that amounted to thirty-one percent of the difference in income between the spouses. *See* 858 N.W.2d 402, 412 (Iowa 2015). In *Mann*, the court went on to note that "[i]f [that] case were before [the court] today on the

same facts, a [thirty-one percent] award would have a larger impact on the payor spouse than in *Gust* because of the tax change." *Mann*, 943 N.W.2d at 21.

I would set Jamie's traditional alimony at $1000.00 per month taking into consideration all relevant factors. I concur in all other respects.